[Cite as *In re ZA.C.*, 2014-Ohio-979.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN THE MATTER OF:

    ZA.C.                                     CASE NO. 1-13-43

ADJUDICATED DEPENDENT
AND NEGLECTED CHILD.

                                              O P I N I O N

[STACY JO CLARK - APPELLANT].
[KRISTOPHER CLARK - APPELLANT].

IN THE MATTER OF:

    ZE.C.                                     CASE NO. 1-13-44

ADJUDICATED DEPENDENT
AND NEGLECTED CHILD.

                                              O P I N I O N

[STACY JO CLARK - APPELLANT].
[KRISTOPHER CLARK - APPELLANT].

Appeals from Allen County Common Pleas Court
Juvenile Division
Trial Court Nos. 2011 JG 28348 and 2011 JG 28349

**Judgments Affirmed**

**Date of Decision: March 17, 2014**

Case Nos. 1-13-43, 1-13-44

**APPEARANCES:**

> *William H. White* **for Appellant Stacy Jo Clark**
>
> *F. Stephen Chamberlain* **for Appellant Kristopher Clark**
>
> *Mariah M. Cunningham* **for Appellee ACCSB**

**WILLAMOWSKI, P.J.**

**{¶1}** Appellants Kristopher Clark ("Kris") and Stacy Clark ("Stacy") bring their appeals from the judgments of the Court of Common Pleas of Allen County, Juvenile Division, terminating their parental rights. For the reasons set forth below, the judgments are affirmed.

**{¶2}** Kris and Stacy are the parents of Ze.C., born in 2004, and Za.C., born in 2006.[1] On January 12, 2011, Ze.C. and Za.C. were placed into the temporary care of Kevin Clark ("Kevin") and Angie Clark ("Angie"). Doc. 1. The children were removed from the home when Kris was arrested for a parole violation and Stacy was residing in Florida where she was involved with a children services agency regarding a neglect issue. *Id.* On January 14, 2011, Allen County Children Services Board ("the Agency") filed a complaint alleging that Ze.C. and Za.C. were dependent and neglected children. Doc. 2. The trial court then

---

[1] They are also the parents of the children's older sibling who was placed in the legal custody of relatives and is not subject to this appeal.

appointed Sarah Newland ("Newland") as guardian ad litem for the children on January 20, 2011. Doc. 8. On February 10, 2011, the Agency filed a case plan with the goal of reunification. Doc. 17. The case plan required Kris to complete the following requirements: 1) complete parenting classes through the Agency or an approved agency; 2) obtain adequate income and housing; and 3) complete a drug and alcohol screening and follow the recommendations arising from the screening. *Id.*

{¶3} On March 2, 2011, an adjudicatory hearing was held. Doc. 19. The magistrate determined that the children were dependent and neglected and ordered that the children remain in the temporary care of Kevin and Angie. *Id.* The dispositional hearing was held on March 23, 2011. Doc. 23. The magistrate ordered that the children continue to remain in the temporary custody of Kevin and Angie and that Kris comply with the case plan filed on February 10, 2011. *Id.* On April 19, 2011, the trial court adopted the magistrate's decision finding the children to be dependent and neglected. Doc. 26. The trial court then adopted the magistrate's decision as to the disposition of the matter on June 1, 2011. Doc. 27.

{¶4} On May 17, 2011, the case plan was amended to provide services for Stacy. Doc. 29. The amended case plan continued the same requirements for Kris, but also required Stacy to complete them as well. *Id.* The plan also stated that Kris and Stacy would not allow any person in the home that "will use, sell or

buy illegal drugs from the home." *Id*. at 3. An administrative review of the case plan was held on June 27, 2011. The review held that there was insufficient progress as to the parenting classes as Kris started them, but missed too many. Doc. 30 at 2. At the time of the review, Kris was living in a motel and Stacy was living at a homeless shelter. *Id*. at 3. Both parents had made some progress by attending drug rehabilitation and parenting classes. *Id*. at 4. The review indicated that both parents were attending visitation and maintaining phone contact with the children on a daily basis. *Id*. at 5. Due to the lack of housing, the out-of-home placement was continued. *Id*.

{¶5} On August 2, 2011, an emergency shelter care hearing was held and the magistrate ordered the children placed in the custody of the Agency. Doc. 32. This was necessary when Kevin and Angie notified the Agency that they were no longer willing to care for Za.C. and Ze.C. in their home. *Id*. No other suitable relative placements were available. *Id*. On August 3, 2011, the Agency filed a motion requesting modification of the disposition to grant temporary custody of the children to the Agency. Doc. 33. The motion included a modified case plan indicating that the children would be placed in a certified foster home. *Id*. The modified case plan was signed by Kris, but not by Stacy. *Id.* at 13. A hearing was held on the motion on October 5, 2011. Doc. 54. The magistrate recommended that the disposition be modified and that temporary custody of the children be

granted to the Agency. *Id*. The trial court adopted the magistrate's decision on November 2, 2011.

{¶6} On November 1, 2011, the Agency filed a motion for contempt alleging that Kris had not complied with the case plan. Doc. 56. Also on November 1, 2011, the Agency filed a motion for contempt alleging that Stacy had not complied with the case plan. Doc. 58. A hearing was held on January 18, 2012, regarding these motions. Doc. 82. Stacy was present and admitted to being in contempt. *Id*. Kris was not present as he was incarcerated at that time with the possibility of the incarceration being of a significant time. *Id*. The magistrate determined that Stacy was in contempt, but continued the matter as to Kris.[2] *Id*. The trial court adopted the magistrate's decision on March 7, 2012. Doc. 85.

{¶7} Meanwhile, on December 9, 2011, the Agency filed a motion to extend the temporary custody of the children. Doc. 64. The Agency stated that Kris and Stacy were making progress by completing parenting classes and by attending visits with the children. *Id*. at 1. The Agency then set forth the following requirements for reunification to occur.

> **In order for reunification with the parents to occur, the parents need to take random urine screens with the results being negative for illegal substances and medications not prescribed to them, to comply with services to address their substance abuse**

---

[2] The motion for contempt against Kris was later withdrawn. Doc. 90 and 91.

**issues, to obtain and maintain appropriate housing and to obtain and maintain a legal source of income.**

*Id*. The motion included an amended case plan dated November 28, 2011, with the above criteria and showing that some progress had been made. Doc. 65. An administrative review of the case plan was conducted on December 12, 2011. Doc. 71. The review indicated that the parents had completed the parenting class and actively participated in it. *Id*. at 2. It also indicated that the parents were attempting to find housing. *Id*. However, the review also indicated that Kris was discharged from the drug treatment program for non-compliance and that Stacy had not obtained services as required. *Id*. at 3. Kris's drug screens were negative, but Stacy tested positive for opiates. *Id*. The Agency was receiving anonymous reports that the parents were still using heroin. *Id*. The motion to extend the temporary custody of the Agency was recommended to be granted by the magistrate on January 18, 2012, and was adopted by the trial court on March 7, 2012. Doc. 82 and 85.

{¶8} On March 27, 2012, the Agency filed a motion for a review of a case plan removing services for Kris due to his extended incarceration. Doc. 92. On April 18, 2012, the magistrate held a hearing on all outstanding motions. Doc. 108. The magistrate denied a motion by Kris to stay the temporary custody motion (Doc. 87), sentenced Stacy to thirty days in jail for contempt, and granted

the Agency's motion to remove Kris from the case plan services. Doc. 108. The sentence for contempt was stayed on the condition that Stacy comply with the case plan. *Id*. The trial court adopted the magistrate's decision on June 19, 2012. Doc. 115.

{¶9} On May 24, 2012, the Agency again filed a motion to extend the temporary custody of the children. Doc. 111. The motion indicated that Stacy had made progress with drug addiction services, had been sober for more than one month, and had attended scheduled visitations. *Id*. An amended case plan was also filed which required Stacy to retain her sobriety by continuing to work on her drug addiction issues, to obtain adequate housing, and to obtain a legal source of income. Doc. 112. The magistrate held a hearing on this motion on August 16, 2012. Doc. 125. At the conclusion of the hearing, the magistrate recommended that the motion be granted. *Id*. The trial court adopted the decision of the magistrate on October 4, 2012. Doc. 128.

{¶10} On July 18, 2012, Newland filed a motion to withdraw as the guardian ad litem. Doc. 122. The trial court granted the motion on July 20, 2012. Doc. 123. The trial court then appointed John Hopkins ("Hopkins") as the guardian ad litem for the children. Doc. 124.

{¶11} On December 11, 2012, the Agency filed its motion requesting permanent custody of the children. Doc. 133. The Agency alleged that the

children should be removed because 1) Stacy and Kris failed to comply with the case plan (R.C. 2151.414(E)(1)); 2) Stacy's chemical dependency prevented her from providing an adequate home within a reasonable time (R.C. 2151.414(E)(2)); 3) Stacy and Kris had demonstrated a lack of commitment toward the children by failing to provide an adequate home (R.C. 2151.414(E)(4)); and 4) Stacy and Kris had failed to provide basic necessities for the children to prevent neglect (R.C. 2151.414(E)(14)). *Id.* The motion was set for hearing on May 1, 2013. Doc. 148. On April 22, 2013, the Agency requested a continuance. Doc. 158. The motion was granted by the trial court. Doc. 160. The motion requesting permanent custody was set for hearing on July 31, 2013. Doc. 164.

{¶12} On July 26, 2013, Hopkins filed the guardian ad litem report. Doc. 174. Hopkins made the following statements in his report.

> **It should be noted that father has been incarcerated since at least the date of my appointment. Upon the completion of his sentence in Ohio, father is reportedly facing extradition to the State of Florida to possibly serve an additional period of incarceration.**
>
> **Mother expressed to me that she understood what she needed to do to rectify the children being removed from her custody. Her sobriety was the lynchpin of her potential success. She failed. Mother has been unable to stay drug and/or alcohol free. She did regularly visit with the children. That is the only truly positive thing I can say about her caseplan compliance.**
>
> **Neither mother or (sic) father are in a position to provide a safe and stable living environment for any of the children. Mother is**

> **currently facing two felony drug related cases in Allen County, and also has a pending alcohol related charge that has yet to be disposed of. Father is currently incarcerated and his release date is reportedly in February of 2014.**
>
> **\* \* \***
>
> **Simply put, these children need permanency and safety. Mother and father can not provide that at this time, or anytime into the foreseeable future. The Agency is requesting a grant of Permanent Custody on [the children] \* \* \*. I have been given no choice but to recommend those requests be granted as being in the children (sic) respective best interests. \* \* \***

*Id*. at 1-2.

{¶13} The hearing was held on July 31, 2013. Doc. 175. The Agency presented the testimony of six witnesses. The first witness was Danny Trent ("Trent"), who is the maternal uncle of Za.C. and Ze.C. Most of Trent's testimony concerned the status of the children's older sibling who was residing with Trent. Trent testified that although he and his fiancé had considered being the legal custodian of all three of the children, they did not feel capable of doing so at that time. Tr. 19. Trent testified that although he could not take custody of Za.C. and Ze.C., he would like for them to continue to have contact with their older brother. Tr. 20. At the time of the hearing, Za.C. and Ze.C. would come to his home to visit every other weekend. Tr. 21.

{¶14} The second witness was Shelly Stanklus ("Stanklus"), who is Trent's fiancé. Tr. 27. Stanklus testified that she intended to continue to facilitate the

relationship between Za.C., Ze.C., and their older sibling. Tr. 29. She also testified that to her knowledge, the foster mother is intending to apply to adopt Za.C. and Ze.C. Tr. 39.

{¶15} Alexander Clow ("Clow") was the third witness presented. Clow testified that he was the probation officer for Kris in 2011. Tr. 43. Kris was on probation from Florida where he had been convicted of drug possession similar to possession of a prescription drug without a prescription in Ohio. Tr. 44. Clow went to Kris's home on January 10, 2011, due to some information he had received that Kris was using heroin and that there was an individual in the home selling heroin. Tr. 44-45. At the home, Clow observed hypodermic syringes, spoons with burn residue, and a small amount of heroin. Tr. 47. The children were present in the home at that time and the drug paraphernalia was within reach of the children. Tr. 48. During the course of the investigation, it was discovered that Kris had an outstanding arrest warrant for in excess of two dozen charges for narcotic trafficking. Tr. 48-49. Kris admitted to using heroin when Clow spoke to him at the house, so Clow arrested him. Tr. 49. Subsequent home visits were made to various hotel rooms where Kris was living. Tr. 50-51. Clow testified that he could have arrested Kris for illicit usage of prescribed medications, but did not do so. Tr. 52. Kris instead was taken for medical treatment at the hospital. Tr. 52. The supervision period ended with Kris being discharge because the term of

supervision expired. Tr. 54-55. On cross-examination Clow testified that the drugs and drug paraphernalia in the home during the January investigation were found in an upstairs bedroom that was eventually determined to be occupied by a third party. Tr. 58-59. Clow also testified that he did not have personal knowledge that there were outstanding warrants, but it was something he had heard from another party. Tr. 65.

{¶16} The fourth witness was Jack Miller ("Miller"), who was a detective with the Shawnee Township Police Department. Tr. 69. Miller testified that during the summer of 2011, he investigated the sale of heroin involving Kris. Tr. 70. The investigation involved two controlled drug purchases of heroin from Kris by a confidential informant. Tr. 71. After Kris was arrested, he admitted to using heroin. Tr. 72. Kris pled guilty to trafficking and was sentenced to prison. Tr. 73. Miller also testified that when he executed a search warrant for drugs at a home in March of 2012, he learned that Stacy was living there. Tr. 76-77. The search uncovered numerous items of drug paraphernalia along with some drugs. Tr. 77. On cross-examination, Miller testified that Kris acted as a confidential informant for them after his arrest. Tr. 80. At the time of the controlled buys, the children were not present. Tr. 81. Miller also testified that he had no knowledge of whether the search of the home where Stacy was residing implicated Stacy in any way. Tr. 90. To his knowledge, no charges were filed against Stacy. Tr. 90.

{¶17} Brian McKinney ("McKinney") was the next witness for the Agency. McKinney testified that he was employed as a deputy with the Allen County Sheriff's Office and was assigned to the West Central Ohio Crime Task Force. Tr. 92. McKinney testified that in January of 2013, Stacy sold some prescription medicine to a confidential informant. Tr. 93. McKinney then followed Stacy and observed her meeting with a known heroin trafficker. Tr. 93. McKinney arranged to have her vehicle stopped. Tr. 93. The subsequent search of the vehicle disclosed heroin, the remainder of the prescription drugs sold earlier, and the $200 provided to the confidential informant as buy money. Tr. 94. The money and the prescription medicine, which was registered to a third party, were located in Stacy's purse. Tr. 94. Stacy was indicted in July of 2013 for trafficking and possession charges. Tr. 95. At the time of the investigation, Stacy was residing at a hotel known by law enforcement for having a large amount of drug transactions occurring. Tr. 96. Later Stacy was arrested at a location where controlled buys of heroin had occurred. Tr. 98.

{¶18} The final witness for the Agency was Jan Waltmire ("Waltmire"). Waltmire was the ongoing caseworker for Za.C. and Ze.C. Tr. 102. Waltmire testified that at the time the case began, the children were residing with Kris. Tr. 103. The children were removed from the home due to a drug raid on the home. Tr. 104. Stacy was not residing in the home at that time, but came to Lima

between March and April of 2011. Tr. 104. Waltmire testified that Stacy did not immediately contact her when she came to town, but waited approximately one month. Tr. 105. Stacy told Waltmire that she wanted to find a job and obtain a place to live before contacting the Agency. Tr. 106. Waltmire testified that the Agency took custody of the children in August of 2011 after the family placement determined they did not want the children in the home anymore and refused to abide by the court orders. Tr. 106-107.

{¶19} Waltmire testified that the initial case plan did not provide services for Stacy because she was still in Florida. Tr. 108-109. The case plan was then modified in June of 2011. Tr. 109. According to Waltmire, Kris was required to attend parenting classes to learn how his drug usage and that lifestyle were unhealthy for the children. Tr. 110. Kris completed the required parenting classes[3] in November of 2011. Tr. 110. Waltmire testified that she observed Kris with the children during visits and there were no concerns. Tr. 111. The second requirement for Kris was that he would provide for the needs of the children because when the children were removed, they had not been enrolled in school after being in Ohio for a month and the household had very little food. Tr. 111-12. Kris was also required to work with a family aide to obtain benefits through the Ohio Department of Job and Family Services and to find employment. Tr. 113.

---

[3] Due to the different ages of the three children under the case plan, Kris was required to complete the Parent Project Senior and Parent Project Junior classes.

Kris was assigned a family aide, but the services were discontinued when Kris failed to cooperate. Tr. 114. Waltmire testified that as to the requirement to provide adequate housing, they were looking for a safe and stable home environment without illegal drugs. Tr. 114. At the time of the hearing, Kris's residence was prison for multiple felony convictions with an anticipated release date of February 2014. Tr. 115. After prison, Kris would be required to return to Florida to satisfy some outstanding charges there. Tr. 116. Prior to incarceration, Kris did not have adequate housing at any time. Tr. 116-17. Kris did not suffer from any evictions or utility shutoffs because he only resided in hotel rooms. Tr. 120. There were ongoing concerns about the safety of Kris's residences because he continued to interact with Stacy who repeatedly tested positive for heroin and cocaine, so he failed to provide a residence that was drug free. Tr. 121. Kris did complete the drug screening as required by the case plan. Tr. 121. Waltmire knew there were recommendations made, but was unable to testify as to what they were because Kris did not sign the release of information. Tr. 122. Kris did admit to Waltmire that he had not followed through with the recommendations. Tr. 123. Two of the four valid drug screens given came back positive. Tr. 125. One was positive for morphine and opiates and the other was positive for opiates and cocaine. Tr. 125.

{¶20} The case plan also set the same requirements for Stacy for the same reasons. Tr. 125. Stacy completed the parenting classes in November of 2011 as required by the case plan. Tr. 126. Waltmire testified that she has observed Stacy with the children and any concerns she had were minor. Tr. 127. A family aide was assigned to Stacy and was able to provide transportation, assist in job hunting, and assist in finding temporary housing. Tr. 127-28. The services were terminated after Stacy refused to cooperate. Tr. 128. The family aide was again offered in August of 2012, but Stacy refused the help when she learned it would be the same aide. Tr. 128-29. Waltmire testified that the concerns with adequate housing were never addressed by Stacy as she never reported an address that was not a motel, a jail cell, or a rehabilitation facility. Tr. 129. Stacy went to the Phoenix House for drug rehabilitation and stayed less than a month. Tr. 130-31. Stacy did not complete that program. Tr. 131. Stacy later went to the Blue House, which was another residential rehabilitation facility. Tr. 131. Stacy lived there for five months, but did not successfully complete the program. Tr. 131-32. Stacy also attempted an in-house rehabilitation program at Maryhaven, where she stayed for ten days before quitting. Tr. 132-33. At the beginning of 2013, Stacy was admitted to the State of Ohio Psychiatric Hospital where she remained for eight days. Tr. 133. Waltmire testified that she had concerns about Stacy's ability to provide a safe environment because she continued to be involved in illegal drug

activity and being around others involved, such as Kris and her brother, Jason. Tr. 136. Stacy submitted to fourteen drug screens. Tr. 138. One was negative, one was invalid, three were positive for Suboxone[4], and the rest were positive for heroin, cocaine, THC, or a mixture of those drugs. Tr. 138. Stacy's last drug screen was done in June 2013, and she tested positive for THC. Tr. 138. Waltmire testified that she was also concerned about Stacy's use of alcohol. Tr. 139. Stacy claimed to have given up heroin but stated that she has replaced it with alcohol and she has had some intoxication charges. Tr. 139.

{¶21} On cross-examination Waltmire testified that Stacy and Kris successfully completed that parenting class and were active participants in it. Tr. 216. Waltmire also testified that although Stacy and Kris had found housing at one point, the Agency would not assist in paying the deposit due to the overall lack of compliance with the case plan. Tr. 217-18.

{¶22} Case plans are required to be reviewed every three months. Tr. 142. The initial plan was done in January of 2011, so there was a review every third month. Tr. 142-43. Of all of the reviews, Kris attended one and Stacy attended three. Tr. 143. The Agency filed a motion for contempt against both parents for failure to follow the case plan. Tr. 143. The motion concerning Kris was withdrawn when he went to prison. Tr. 144. Stacy was sentenced to 30 days in

---

[4] That result was expected as it occurred while she was at Blue House and she was being given it to help her beat her addiction to heroin.

jail which was suspended on condition that she comply with the case plan. Tr. 144. Stacy failed to comply, but the Agency did not file to have the sentence invoked. Tr. 145. Waltmire testified that the Agency was hoping Stacy would continue the drug rehabilitation programs and wanted to give her a chance to help herself. Tr. 145.

{¶23} Waltmire testified that Kris and Stacy were each offered visits once a week. Tr. 149. Kris consistently attended the visits until his incarceration. Tr. 149. Stacy consistently attended the visits until March of 2013, when she was incarcerated and missed visits until May of 2013. Tr. 149-50. Stacy also missed visits in July of 2013 due to illness and incarceration. Tr. 151. Waltmire testified that Trent and Stanklus had supervised some visits between the children, Stacy, and Kris with the approval of the Agency. Tr. 151-52. Waltmire also testified that Kris has concerns about Stacy's current boyfriend visiting the children because he is a drug dealer. Tr. 152-53. Stacy has indicated that the new boyfriend will be raising her children with her. Tr. 153.

{¶24} Based upon everything the Agency had offered and the lack of progress on the case plan by Kris and Stacy, Waltmire testified that she did not believe there was anything further the Agency could offer to assist in reunification. Tr. 154. Waltmire testified that the children could not be placed with Kris in a reasonable amount of time because he had six more months in

prison in Ohio and has additional time pending in Florida. Tr. 154-55. Waltmire testified that the children could not be placed with Stacy within a reasonable time because after two and a half years, she still was not drug free and still did not have adequate housing. Tr. 155. Waltmire concluded by testifying that an award of permanent custody to the Agency was necessary for the good of the children. Tr. 160-61.

> * * * [T]wo and a half years ago, they were removed from their dad, and their mom, you know, two years later, or two months later came, month to two months later, came to Florida and – or came from Florida to Ohio, and she – neither one of them attempted to locate house – adequate housing for them. And the whole time of my case, or this case, the only thing that they have continued to do is – is to use drugs and live from place to place. They have never lived in a home that's belonged to them. It's always either been motel rooms, or, unfortunately, a jail cell. The only thing that they've consistently done is visit them weekly. They have – they have never – they've never consistently stopped in a place and thought about their children and – and asked – and looked at the case plan and asked to do what they've, you know, to do what, you know, do what the case plan or the court has asked them to do to get their children back.

Tr. 161.

{¶25} Once the Agency rested its case, Kris presented his case. The first witness for Kris was Marcia Burden ("Burden"), Kris's mother. Tr. 248-49. Burden testified that in January of 2011, the Agency asked if she would take the children, but everything was crazy, so she did not give them an answer. Tr. 250. Burden testified that Kris was on Oxycontin to manage the pain from the loss of

-18-

his leg. Tr. 256-57. Although Burden has contacted the Agency about the children, they do not return her calls. Tr. 260. Burden also stated that she wanted to have custody of the children.[5] Tr. 261-62. From Burden's contacts with Kris while he has been in prison, she believes that he is no long using illegal drugs. Tr. 266. In Burden's opinion, Kris would be able to care for the children soon after he is released from prison. Tr. 266-67.

{¶26} The final witness was Kris. Kris testified that his release date would be in February of 2014.[6] Tr. 278. On April 23, 2013, Kris received a warrant from Florida informing him that he owed outstanding fines and probation fees and that he still had to complete a hundred hours of community service. Tr. 277. Kris testified that he does not believe that he will be required to serve any time, just pay the fees. Tr. 277-78. While in prison, Kris was prescribed Neurontin for pain due to his prior injuries and also received Ultram for a shoulder injury at the Allen County Jail. Tr. 280. Kris testified that Kevin did not have a problem with keeping the kids, but Angie did because she did not like him. Tr. 290-91. Kris testified that he did not cooperate with the family aide because she just wanted to give him rides to find a job, but he was receiving disability and workman's

---

[5] Although Burden testified to this, she did not file a motion to be named the legal custodian of the children.

[6] Kris testified that he was originally scheduled to be released December 28, 2013, but had an additional 46 days added to the overall sentence as a result of a plea agreement to a charge that had been outstanding. This leads to a final release date of February 12, 2014. Tr. 274.

compensation for his injury and had to follow the proper procedures in looking for work. Tr. 295. Before he could take a job without negatively affecting his benefits for his injury, Kris would need to be evaluated by the Bureau of Vocational Rehabilitation. Tr. 297. Kris denied that the family aide ever attempted to help him find housing. Tr. 299. Kris also testified that before his incarceration he received $101 a month in disability and $340.84 a week from worker's compensation in North Carolina. Tr. 301. Upon his release from prison, he will once again receive worker's compensation benefits. Tr. 302. Since his incarceration, Kris admitted that he has used an illegal drug on one occasion, but it was more than a year prior to the hearing. Tr. 302. Kris testified that although he is in prison, illegal drugs of any nature are readily available. Tr. 303. Kris testified that he had been clean for 19 months. Tr. 303. While in prison, Kris started attending both Narcotics Anonymous and Alcoholics Anonymous meetings. Tr. 303. In addition, he has taken classes in money management and other classes to help him take control of his life. Tr. 304. Kris testified that he loved his children and would like to either see them kept in temporary custody until he can take them or see legal custody given to a family member. Tr. 305-306.

{¶27} On cross-examination, Kris admitted that he came to Ohio with the children because children's services in Florida wanted one of them to remove the

children from the home. Tr. 308. Kris also admitted that he was charged with domestic violence in April of 2008, but he could not recall what happened. Tr. 311. Kris testified that the one time he had used an illegal drug while in prison, the drug he used was marijuana. Tr. 313. Kris testified that he turned to heroin when the pain pills were not sufficient to stop the pain. Tr. 314.

{¶28} Following Kris's testimony, Kris rested his case. Tr. 323. Stacy did not present any evidence and the Agency did not present any rebuttal testimony. Tr. 324. After the hearing, the trial court terminated the parental rights of Kris and Stacy and granted permanent custody of Za.C. and Ze.C. to the Agency. Doc. 175. The judgment entry was filed on August 21, 2013. *Id.* Stacy filed her notice of appeal on August 30, 2013. Doc. 178. On September 9, 2013, Kris filed his notice of appeal. Doc. 183. The following assignments of error are raised on appeal.

### Stacy's First Assignment of Error

**The trial court committed error in granting permanent custody to [the Agency], this finding was contrary to law and the facts presented.**

### Stacy's Second Assignment of Error

**The trial counsel of [Stacy] failed to aggressively pursue her position and/or defense to the finding.**

**Kris's First Assignment of Error**

**The trial court committed error in granting permanent custody of the minor [children] to [the Agency].**

**Kris's Second Assignment of Error**

**The trial court erred in overruling the mother's request for a continuance in order to obtain records and witnesses relevant to the hearing.**

**Kris's Third Assignment of Error**

**The trial court erred when it prohibited counsel for the father to inquire into the facts and circumstances of felony drug offenses of the father when the [Agency] was using the drug offenses as a basis to find that the minor children could not be placed with the father within a reasonable time.**

{¶29} Both Stacy's and Kris's first assignments of error allege that the trial court erred by granting the motion for permanent custody. They both challenge the decision as being unsupported by the evidence. The right to raise one's own child is a basic and essential civil right. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. Id. When considering a motion to terminate parental rights,

the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include, in pertinent part, as follows.

**(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**

**(a)    The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**\* \***

**(2)    With respect to a motion made pursuant to [R.C. 2151.413(D)(1)], the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.**

**(C) In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child.**

**A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section * * * but shall not be submitted under oath.**

**\* \***

**(E)  In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence.  If the court determines by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**

**(1)  Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**(2)  Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for**

**the purposes of division (A)(4) of section 2151.353 of the Revised Code;**

**\* \* \***

**(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

**\* \* \***

**(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.**

R.C. 2151.414. A court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of parental rights have been established. *See In re B.G.W.,* 10th Dist. Franklin No. 08AP-181, 2008-Ohio-3693 and *In re Nevaeh J.*, 6th Dist. Lucas No. L-06-1093, 2006-Ohio-6628, ¶ 17 (citing *In re Forrest S.*, 102 Ohio App.3d 338, 657 N.E.2d 307 (6th Dist. 1995)).

{¶30} In considering the evidence as discussed above, the trial court made the following findings of fact.

**15.  This case can be fairly summarized as follows.  The children have been in out-of-home care since January of 2011, a period of over two and a half years.  During that time, the parents completed only one area of services required by the case plan, i.e., attending and completing parenting classes.  They have been unable to establish any form of stable, suitable housing, primarily living for brief stretches of time with friends in homes with drugs and drug paraphernalia, or in run-down motels unsuitable for children.  The mother in particular continues to abuse drugs now asserting that she favors alcohol as her drug of choice.  The father first testified that his drug use had ceased while incarcerated and that he had not used drugs for approximately one year.  He later acknowledged using marijuana in prison as recently as November of 2012.  Neither parent has in the two and a half years since the removal of their children demonstrated either the willingness of (sic) the ability to even minimally provide an adequate place of residence for themselves or the [children], or to successfully address their chronic substance abuse issues.**

**16.  The parents have failed to support the [children], have failed to provide an adequate, stable and permanent home for the [children], and have failed to provide food, clothing, shelter or any other basic necessities for the [children].**

**17.  The Court finds that the minor [children] cannot be placed with either parent because following placement of the [children] outside the home, notwithstanding reasonable case planning and diligent efforts by the [Agency] to assist the parents to remedy the problems that initially caused the [children] to be placed outside the [children's] home (R.C. 2151.414(E)(1)).  Further both parents have demonstrated a lack of commitment toward the [children] by failing to regularly support the [children] and by other actions showing an unwillingness to provide an adequate, permanent home for the [children] (R.C. 2151.414(E)(4)).  Both parents have demonstrated an unwillingness and inability to provide food, clothing, shelter and other basic necessities to prevent the [children] from suffering emotional or mental neglect (R.C. 2151.414(E)(14)).**

Doc. 175, 4-5. There was substantial evidence presented in the testimony that both Kris and Stacy had not resolved their drug issues during the two and a half years that the case plan was in place. There was also substantial evidence that both had participated in illegal activities, that neither of them had procured adequate housing, and that Stacy had no legal source of income. At the time of the hearing, Kris was incarcerated and Stacy was facing incarceration. Both had used illegal substances within the past year. The only aspect of the case plan that either of them completed was the parenting classes. Although both parents maintained contact with the children and visited them faithfully, at least when they were not incarcerated or in a rehabilitation facility, the evidence clearly and convincingly shows that neither of them took steps during the pendency of the case plan to seriously address the issues which resulted in the removal of the children from the home. Since there is competent and credible evidence that clearly and convincingly supports the trial court's findings, the trial court did not err in finding that the children could not be placed with either Stacy or Kris within a reasonable period of time as set forth in R.C. 2151.414(E).

{¶31} Once the trial court has entered a finding that the child cannot be placed with either parent within a reasonable time, the trial court must then make a

determination as to whether a grant of permanent custody is within the best interest of the child.  R.C. 2151.414(B)(1).

> **(D)(1)  In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * *, the court shall consider all relevant factors, including, but not limited to, the following:**
>
> **(a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;**
>
> **(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**
>
> **(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414(D).  The trial court in this case stated that it had considered the relevant factors under the statute and determined that it was in the best interest of the children to grant the motion for permanent custody.  Doc. 175, 5.  The Agency presented testimony that the children enjoyed interacting with each other and that the children were integrated into their homes.  R.C. 2151.414(D)(1)(a).  The

Agency also presented evidence indicating that the children would likely be adopted by their foster mother as she had expressed a desire to do so. The relationship between the children and their older sibling would be maintained as all the involved parties wished for that relationship to continue. R.C. 2151.414(D)(1)(a). The guardian ad litem indicated that although the children were too young to express their views, he felt it was in the best interest of the children to be placed with the Agency. R.C. 2151.414(D)(1)(b). The record indicates that the children had been in the temporary custody of the Agency for approximately 17 consecutive months at the time the motion for permanent custody was filed. R.C. 2151.414(D)(1)(c). Finally, the Agency presented the testimony of Waltmire that the children needed a permanent placement and that the only way to achieve that was to grant the motion of the Agency. R.C. 2151.414(D)(1)(d). Thus all of the relevant factors set forth in R.C. 2151.414(D) were supported by competent, credible evidence.[7] Given the evidence before it, the trial court's judgment granting the motion for permanent custody is supported by clear and convincing evidence. Stacy's first assignment of error and Kris's first assignment of error are overruled.

---

[7] The fifth factor is whether a factor set forth in R.C. 2151.414(E)(7) to (11) applies, which it did not. Thus, this factor is not relevant.

**{¶32}** Stacy's second assignment of error argues that her trial counsel was ineffective for failing to aggressively defend her position. Parents in actions to terminate parental rights are entitled to competent representation. *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 56.

> **In Ohio, a properly licensed attorney is presumed competent. Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301, 209 N.E.2d 164. Therefore, the burden of showing ineffective assistance of counsel is on the party asserting it. State v. Smith (1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267. Trial strategy and even debatable trial tactics do not establish ineffective assistance of counsel. Additionally, in fairly assessing counsel's performance, there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. State v. Conway, 109 Ohio St.3d 412, 848 N.E.2d 810, 2006–Ohio–2815, ¶ 101.**
>
> **"[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." Strickland v. Washington (1984), 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674. In order to succeed on her claim of ineffective assistance of counsel, appellant must satisfy a two-prong test. First, she must demonstrate that her trial counsel's performance was deficient. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. This requires a showing that her counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. If she can show deficient performance, she must next demonstrate that there exists a reasonable probability that, but for her counsel's errors, the result of the trial would have been different. Strickland, 466 U .S. at 694, 104 S.Ct. at 2068.**

*Id.* at ¶ 57-58.

**{¶33}** Stacy argues in her assignment of error that her counsel was ineffective for failing to present evidence on her behalf or to call witnesses to testify on her behalf. This court notes that although trial counsel did not present testimony or evidence, he did perform other duties of counsel. Trial counsel cross-examined the witnesses for the Agency and for Kris extensively. Trial counsel also presented a closing argument requesting one more chance for Stacy. Prior to trial, counsel filed motions for discovery. At trial, Stacy's trial counsel requested a continuance to obtain the records that he had learned about the previous day.[8] A review of the record does not indicate that counsel's representation was of a caliber to be classified as deficient. The reason for the failure to present evidence may be one of trial strategy that this court cannot second guess.[9] Thus, Stacy does not meet the first prong of the test to show that counsel was deficient. Additionally, Stacy presents no argument as to how this alleged evidence would have helped her. Although she hints in her brief that there may have been evidence of mental health issues and reasons for her poverty, there is nothing presented to this court upon which we could make a determination that

---

[8] The motion was denied because although trial counsel did not know of the records or Stacy's stay at the facility, Stacy knew and was told by the Agency to contact her attorney, but did not do so. Tr. 12-13.

[9] Given the evidence presented by the Agency as to Stacy's pending drug charges, counsel's ability to put Stacy on the stand would likely have been limited by her need to claim her fifth amendment right against self-incrimination.

the result would be different if her counsel had acted differently. The second prong of the test for ineffective assistance of counsel is also not met. Stacy's second assignment of error is overruled.

{¶34} Kris's second assignment of error argues that the trial court erred by overruling Stacy's request for a continuance in order to obtain records and witnesses relevant to the hearing. Initially this court notes that the motion in question was made by Stacy and was not joined by Kris. Tr. 10-12. Thus the denial of the motion is an issue which must be raised by Stacy if she has an objection to the ruling. "[G]enerally, an appealing party may not ordinarily complain of an error committed against a non-appealing party." *In re J.T.*, 3d Dist. Seneca Nos. 13-07-31, 13-07-32, 2008-Ohio- 1650, ¶ 15. Kris lacks standing to raise this matter on appeal when the motion was not made by Kris and Stacy has chosen to not appeal the matter. *In re J.W.*, 3d Dist. Seneca No. 13-12-10, 2012-Ohio-3528, ¶ 32. Kris's second assignment of error is overruled.

{¶35} Kris argues in his third assignment of error the trial court erred by not allowing him to question Miller regarding the drug transactions. Trial courts have broad discretion in deciding whether to admit evidence. *Moore v. Moore*, 182 Ohio App.3d 708, 2009-Ohio-2434, 914 N.E.2d 1097, ¶ 15 (3d Dist.). Reviewing courts should not reverse evidentiary decisions absent a showing of an

abuse of discretion that creates material prejudice. *State v. Mooris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14.

> **{¶36}** In this case, the error alleged by Kris occurred as follows.
>
> **Q. Who was the confidential informant on the case that you said that the controlled – the controlled buys for this case?**
>
> **Ms. Cunningham:  Objection, Your Honor, as to relevance again.**
>
> **The Court:  Argument, Mr. Chamberlain?**
>
> **Mr. Chamberlain:  We're talking about whether his fitness, and also he's testified that the discussions he had with [Kris] afterwards, that he's facilitating buying heroin for friends, the implication is that – the implication that the State wants to present is that [Kris] is somehow a drug dealer.  The testimony so far that's come out, that we've just at least touched the surface on, is that he is merely acting as a go-between for friends, so the nature of whoever the confidential informant was at the time could have been a friend of [Kris's], and that would bolster the idea that [Kris] is not a major drug dealer, which is what the State is trying to portray.**
>
> **The Court:  Objection is sustained.  We're not going to re-try a criminal case up here.  This is about the children and the statute relating to the children and permanent custody.**

Tr. 80-81.  The trial court did not abuse its discretion in sustaining the objection because the fact that Kris had been convicted of trafficking in drugs was proven by the judgment entries of conviction.  The identity of the confidential informant was not relevant.  In addition, the trial court did not find that the children could not be placed with Kris because he was a drug dealer, but rather because he had not

successfully addressed his chronic substance abuse issues as required by the case plan. Doc. 175, 5. The trial court merely acknowledged that Kris was incarcerated for drug trafficking with an anticipated release date of February, 2014. *Id*. at 4. Thus, even if there was error in not finding the evidence relevant, the effect was not prejudicial. Kris's third assignment of error is overruled.

{¶37} Having found no error in the particulars assigned and argued by the Appellants, the judgments of the Court of Common Pleas of Allen County, Juvenile Division, are affirmed.

*Judgments Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/jlr**